UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                   )
COMMONWEALTH FOREIGN               )
EXCHANGE, INC.,                    )
                                   )
            Plaintiff,             )
v.                                 )        Case No.
                                   )
                                   )
PE GLOBAL PARTNERS, LLC;           )
JEFFREY SCANLON; SAYGIN ESENER     )
CARL EASTON; ALEXANDER             )
FRIEDMAN; AND JOHN DOES 1-10,      )
                                   )
                                   )
            Defendants.            )
_____)
```

## VERIFIED COMPLAINT

Plaintiff, Commonwealth Foreign Exchange, Inc. ("Commonwealth" or "Plaintiff"), by and through its undersigned counsel, hereby files this Verified Complaint against PE Global Partners, LLC d/b/a Payment Earth ("Payment Earth"), Jeffrey Scanlon ("Scanlon"), Saygin Esener ("Esener"), Carl Easton ("Easton"), Alexander Friedman ("Friedman") and John Does 1-10 (fictitious names) (collectively "Defendants").

## NATURE OF THE ACTION

1.      Defendants Scanlon and Esener were once two of Commonwealth's most valued and trusted employees, with Defendant Scanlon serving as Commonwealth's Sales Manager and Defendant Esener serving as Commonwealth's Managing Director.  It has recently been revealed that Scanlon and Esener engaged in an unethical and deceitful scheme to damage Commonwealth by conspiring together, and soliciting others to join in their efforts, to attempt to

manipulate Commonwealth's customers' accounts from within, in connection with their preparation to unfairly compete against Commonwealth by forming Payment Earth.

2.    As part of this scheme, Scanlon and Esener utilized Commonwealth's own equipment and resources to access Commonwealth's confidential and proprietary business information and trade secrets in preparation for—and continuing to present—an effort to disparage the reputation of Commonwealth and unfairly solicit its customers using confidential client information from confidential customer lists.

3.    While still employed by Commonwealth, Scanlon and Esener devised a scheme to surreptitiously, and in breach of their fiduciary obligations to Commonwealth, improperly manipulate the prices on Commonwealth accounts they were servicing.

4.    Meanwhile, while still employed by Commonwealth, and in furtherance of their scheme, on May 4, 2016, Scanlon and Esener formed Payment Earth, an entity that was specifically designed to leverage Commonwealth's own confidential and proprietary business information and trade secrets to compete against Commonwealth.

5.    Recently, Commonwealth learned that Scanlon, Esener, and Payment Earth have been engaged in efforts to solicit other Commonwealth employees, induce them to join in their price manipulation scheme, and utilize Commonwealth's confidential and proprietary business information and trade secrets to poach Commonwealth clients from confidential customer lists.

6.    In furtherance of their scheme, the Defendants have initiated a campaign to solicit Commonwealth's clients, from confidential customer lists, through the use of targeted communications which include false and misleading statements in violation of the law.

7.    Defendants are further attempting to poach Commonwealth's customers by leveraging the prices they improperly manipulated while employed by Commonwealth, and are

#57559901

more easily able to do so given that Defendants have not obtained licenses to conduct money transmission and/or currency exchange business in a majority of the states in which the customers poached by Defendants reside.

8.    Commonwealth has sustained and will continue to sustain irreparable harm in connection with the Defendants' breach of their fiduciary duties and their unauthorized and illegal misappropriation of Commonwealth's confidential and proprietary business information and trade secrets to establish a business intended to compete directly with Commonwealth by impermissibly poaching Commonwealth's clients through the use of false, misleading, and disparaging statements.

9.    Commonwealth accordingly seeks compensatory, statutory, and punitive damages, as well as, a preliminary and permanent injunction:

> a.    Preliminarily and permanently enjoining Payment Earth from soliciting or employing any other current or former Commonwealth employees that are subject to non-competition agreements for the duration of such terms;
>
> b.    enjoining Defendants Easton and Friedman from soliciting or employing any current or former Commonwealth employees for a period of 12 months;
>
> c.    enjoining Defendants Easton and Friedman from violating their post-termination prohibitions on competing against Commonwealth, including, but not limited to, enjoining acceptance of employment with a competitor of Commonwealth, including, but not limited to, Payment Earth, for a period of 12 months;
>
> d.    enjoining Defendants from disparaging Commonwealth or its services;

#57559901

e.    enjoining all Defendants from disclosing or using Commonwealth's confidential and proprietary business information and trade secrets, including, but not limited to, Commonwealth's customer and pricing information;

f.    compelling Defendants to return to Commonwealth all of Commonwealth's confidential and proprietary business information and trade secrets, including, but not limited to, Commonwealth's customer and pricing information.

## PARTIES

10.    Commonwealth is a Rhode Island corporation with its principal place of business in Providence, Rhode Island.

11.    Payment Earth is a Delaware limited liability company with its principal place of business in Escondido, California. Scanlon is a member of Payment Earth and is a resident of California. Upon information and belief, all of Payment Earth's members are residents of California.

12.    Scanlon is a resident of California, whose last known mailing address is 23396 Camellia Lane, Murrieta, California 92562. Scanlon was Plaintiff Commonwealth's Sales Manager. In the course of his employment by Commonwealth, Defendant Scanlon was entrusted with Commonwealth's confidential information, trade secrets, and property. Scanlon signed an employment agreement agreeing that "exclusive jurisdiction, sole venue and proper forum for all such matters shall be in courts located in Rhode Island" for "[a]ll matters relating to this Agreement." A copy of Scanlon's employment agreement with Commonwealth is attached hereto as Exhibit A.

13.     Esener is a resident of California, whose last known mailing address is 450 J. Street #3131, San Diego, California 92101.  Esener was Plaintiff Commonwealth's Managing Director.  In the course of his employment by Commonwealth, Defendant Esener was entrusted with Commonwealth's confidential information, trade secrets, and property.  A copy of Esener's employment agreement with Commonwealth is attached hereto as Exhibit B.

14.     Friedman is a resident of Washington, D.C., whose last known mailing address is 2501 Calvert Street NW #501, Washington, D.C. 20008.  Friedman was an Account Executive with Plaintiff Commonwealth.  At the time Friedman was hired by Commonwealth, he was a resident of Rhode Island.  In the course of his employment by Commonwealth, Defendant Friedman was entrusted with Commonwealth's confidential information, trade secrets, and property. Friedman signed an employment agreement agreeing that "exclusive jurisdiction, sole venue and proper forum for all such matters . . . shall be in courts located in Rhode Island" for "[a]ll matters relating to this Agreement."  A copy of Friedman's employment agreement with Commonwealth is attached hereto as Exhibit C.

15.     Easton is a resident of Virginia, whose last known mailing address is 1805 S. Nelson Street, Arlington, VA 22204.  Easton was an Account Executive with Plaintiff Commonwealth.  In the course of his employment by Commonwealth, Defendant Easton was entrusted with Commonwealth's confidential information, trade secrets, and property.  Easton signed an employment agreement agreeing that "exclusive jurisdiction, sole venue and proper forum for all such matters shall be in courts located in Rhode Island" for "[a]ll matters relating to this Agreement."  A copy of Easton's employment agreement with Commonwealth is attached hereto as Exhibit D.

#57559901

16. John Does are fictitious parties, the actual identities of which are yet to be discovered, who, upon information and belief, conspired with the other defendants in the scheme to undermine Commonwealth.

## JURISDICTION AND VENUE

17. This Court has jurisdiction under 28 U.S.C. § 1331 because this Court has original jurisdiction over the Defendant Trade Secrets Act claims under 18 U.S.C. § 1836(c), the Lanham Act claims 15 U.S.C. § 1121, and the Computer Fraud and Abuse Act claims under 18 U.S.C. § 1030. This Court has jurisdiction over the common law claims brought herein under the 28 U.S.C. § 1367. Jurisdiction is also proper under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states.

18. This Court has personal jurisdiction over Scanlon, Easton, and Friedman because they agreed to the exclusive jurisdiction of courts in Rhode Island in their agreements with Commonwealth. Payment Earth (and its agents) knew that Commonwealth is a Rhode Island corporation and that it was inducing and interfering with Commonwealth employees who had entered into employment agreements that specified Rhode Island law would govern and that Rhode Island would be the exclusive venue for disputes relating to the agreements. Payment Earth schemed with the individual Defendants to misappropriate property owned by Commonwealth in Rhode Island and has induced defendant Easton and Friedman to improperly solicit Commonwealth clients based in Rhode Island. Payment Earth has already poached one or more Rhode Island customers away from Commonwealth. Defendants targeted Commonwealth, a Rhode Island company, and through the Defendants' misappropriation and disparagement has harmed Commonwealth, thereby committing the alleged acts within this judicial district. Further, Payment Earth has been actively marketing its products and services within this judicial

district, including maintaining an interactive website available to consumers within this district, on which it advertises products and services, whereby consumers in this district can open accounts and utilize Payment Earth's services. In sum, Payment Earth has targeted, made, or established contacts within this judicial district sufficient to permit the exercise of personal jurisdiction by this Court over it.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of events giving rise to this action occurred in this District.

## FACTS

**The Foreign Exchange Industry.**

20. This case involves the cross-border payments and foreign exchange industry, and related financial services. Foreign exchange involves the buying, selling, and exchanging of foreign currencies. It is the market in which currencies are traded.

21. The foreign exchange market ("FX Market") is the largest market in the world by daily trading volume, in which global trading volumes average in the trillions of dollars on a daily basis.

22. Because of the constant fluctuating prices associated with the FX Market, individuals and organizations dealing with international transactions are exposed to certain risks, such as the risk that the cost of goods and services will change as a result of changes in the value of their currency relative to their vendor's currency.

23. In light of their exposure to these foreign exchange risks, individuals and organizations dealing with international transactions utilize foreign exchange payment providers ("FX Payment Providers") in order to help manage foreign exchange risk. These FX Payment Providers also leverage their expertise in sending cross-border payments to minimize transaction

#57559901

fees and delays in transit. FX Payment Providers may also provide settlement credit and other payment services to ensure that the payee receives timely payment in the full amount due. Often, these FX Payment Providers can deliver payments faster and cheaper than can the customer's bank.

24.     Both the FX Market itself and the market for related foreign exchange risk management and cross-border payment-related services are highly competitive.

25.     Because of the highly competitive atmosphere in which FX Payment Providers (like Commonwealth and Payment Earth) operate, FX Payment Providers devote a substantial amount of time and resources into researching the FX Market, developing proprietary strategies and solutions for facilitating and managing international payments and foreign exchange risk exposure, developing relationships with currency providers and payment settlement banks and networks, pricing of their services, and the cultivation and retention of clients.

26.     One of the ways in which FX Payment Providers compete is in their pricing to exchange one currency into another.

27.     Foreign exchange prices are expressed as rates in terms of currency pairs. For example, a rate of EUR/USD 1.2345 would signify that 1 Euro is worth 1.2345 United States dollars.

28.     For FX Payment Providers, revenues earned are based on the difference, or spread, between the rate charged to the customer and the rate at which the FX Payment Provider is able to procure that currency.

29.     The calculation of a particular spread can be dependent on a variety of factors, including based on what has been negotiated with a particular client, the transaction size, currency pair, and other proprietary factors and formulae, which can vary customer to customer.

30.     The foreign exchange industry is a highly competitive environment.  Because the percentages charged by a FX Payment Provider are often low, and are based on foreign exchange prices that are analyzed to the ten-thousandth decimal point, even a fraction of a percentage can make the difference in winning and maintaining accounts.

31.     Because of this highly competitive environment, Commonwealth takes great care to cultivate lasting client relationships and to safeguard its proprietary and confidential information.  If Commonwealth's proprietary and confidential information were to be accessed by Commonwealth's competitors, they could unfairly try to undercut Commonwealth by bidding their services at a lower percentage.

32.     Not an insignificant factor in the formulation of a rate is the overhead expense of the FX Payment Provider, a substantial portion of which is comprised of costs required to maintain money transmission licenses in each state in which its customers are located. Commonwealth's money transmission licenses require it to maintain a minimum of $2 million in net worth, over $20 million in surety bonds, and other substantial expenses to maintain a robust compliance program.

**While Employed at Commonwealth, Defendants Scanlon, Esener, Friedman, and Easton Used and Developed Commonwealth's Confidential, Proprietary, and Trade Secret Information.**

33.     Commonwealth was founded in 1997 in Providence, Rhode Island, with the goal of helping businesses manage their international payments and foreign exchange exposure. Commonwealth helps clients facilitate cross-border transactions by converting their currency into the foreign currency necessary to execute the transaction and facilitating delivery of the foreign currency to the destination country.  Since 1997, Commonwealth has grown from a startup company to an established FX Payment Provider.

#57559901

34.     In the FX Payment Provider industry, developing and maintaining strong customer relationships and earning a reputation for integrity and providing quality and effective service is critical to commercial success. Such customer relationships and strong reputation have been fundamental, and remain fundamental, to Commonwealth's growth and success.

35.     Defendant Scanlon was hired by Commonwealth in 1998 as Commonwealth's second sales person. Scanlon worked at Commonwealth for over 17 years, eventually rising up to the position of Commonwealth's Sales Manager.

36.     Defendant Esener was hired by Commonwealth in 2003, working for 14 years until becoming Commonwealth's Managing Director.

37.     In their roles, Scanlon and Esener were among some of the most valued and trusted employees and had access to—and utilized—Commonwealth's critical confidential and proprietary business information, including, but not limited to, financial information, business and marketing plans, research and analysis, pricing strategies and formulae, and customer and client information and preferences.

38.     Throughout their tenure at Commonwealth, the company invested significant resources in training and supporting the development of both Scanlon and Esener, as well as other sales personnel (including Defendants Friedman and Easton). In particular, Commonwealth spends substantial sums and resources to develop confidential and trade secret information to attract clients. Critical to Commonwealth's success is its relationships with its customers and clients, which are founded upon trust and confidentiality, including sensitive and confidential financial and business planning information of clients.

#57559901

39.     Scanlon and Esener (as well as Friedman and Easton) would not have been able to perform their jobs at Commonwealth without utilization of Commonwealth's resources and confidential and proprietary business information and trade secrets.

**Commonwealth Took Reasonable Steps to Protect its Confidential and Proprietary Business Information and Trade Secrets.**

40.     Commonwealth has worked to protect its confidential and proprietary business information and trade secrets by requiring its employees, including the individual Defendants, to treat such information with the strictest of confidentiality.

41.     For example, each of the individual Defendants have signed employment agreements containing a confidentiality provision prohibiting the use or disclosure of Commonwealth's trade secrets and confidential information.  See Exhibit A through D.

42.     Also, as employees of Commonwealth, each of the individual Defendants were issued copies of Commonwealth's employee handbook which further notified the individual Defendants of their obligations with respect to confidentiality, including a provision which provides:

> "Our clients and other parties with whom we do business entrust the company with important information relating to their businesses. It is our policy that all information considered confidential will not be disclosed to external parties or to employees without a 'need to know.' Confidential information incudes trades secrets, pricing, business strategies, customer lists, the development of systems, processes, products, know-how and technology.   If an employee questions whether certain information is considered confidential, he/she should first check with his/her immediate supervisor."

43.     In addition to these explicit confidentiality provisions, Commonwealth also protects its trade secrets and confidential information by requiring employees, including the Defendants, to have usernames and individualized passwords to access data regarding Commonwealth clients and customers.  This confidential client information is stored in

#57559901

password-protected and restricted electronic databases. Client names are disclosed internally only on a strict "need to know" basis and efforts are taken to avoid disclosure of the identity of clients externally. Each of the individual Defendants also participated in Code of Conduct Training, which includes, among other things, training on information security and keeping trade secrets confidential.

44. Commonwealth also utilizes various policies and other security measures, including for example, preventing use of removable storage devices like USB drives, to restrict the non-secure transmittal of confidential information via email and other online means.

**Commonwealth's Confidential and Proprietary Business Information and Trade Secrets are of Significant Commercial Value.**

45. The confidential and proprietary business information and trade secrets that the individual Defendants helped develop, had access to, and used at Commonwealth has significant commercial value. In particular, Commonwealth's compilation of client identities, addresses, phone numbers, and email addresses, and their respective foreign exchange product and service preferences are of significant value to competing FX Payment Providers (like Payment Earth) and other commercial entities because such information provides such entities with information that would not otherwise be available to them. This is especially true given that Commonwealth's customer base is largely composed of private small to medium size enterprises that utilize a niche service and about which information is not readily available.

46. The individual Defendants have signed employment agreements acknowledging the significant value of Commonwealth's goodwill with its customers. See Exhibit A through D.

47. A competitor of Commonwealth, like Payment Earth, who is able to misappropriate and misuse Commonwealth's confidential and proprietary business information and trade secrets would gain an unfair advantage over Commonwealth, which has spent

considerable time, expense, and effort to develop such information. To highlight, Commonwealth's confidential and proprietary business information and trade secrets provide a pre-vetted list of potential clients who are in need of the specific and unique service of foreign exchange-related services, as opposed to the tens of millions of other entities that have no need for such services. Therefore, a pre-vetted list containing customer contact information, service needs, pricing, seasonality issues, and preferences provides tremendous value.

48.     Such information is especially valuable to Payment Earth, a new entrant into the FX Payment Provider industry, that, upon information and belief, has sought to avoid the substantial time and expense of obtaining the required money transmitter licenses in each of the states in which such customers are located.

49.     To highlight, Commonwealth is not only registered to be a federal Money Services Business, but it also maintains or has applied for a separate money transmitter license in each state (and the District of Columbia) in which it is required to do so.

50.     In contrast, the only states in which Payment Earth states that it "Maintains MSB licenses or has exemptions" are Missouri, Florida, Virginia, Wisconsin, Pennsylvania, North Carolina, Massachusetts, Oklahoma, Illinois, Minnesota, and the District of Columbia.

51.     Upon information and belief, Payment Earth has solicited prospective customers, accepted business, and/or derived revenues from foreign exchange or money transmission business throughout the United States, including multiple states in which it does not maintain a money transmission license.[1]

---

[1] Upon information and belief, Payment Earth has accepted business and/or derived revenues from foreign exchange or money transmissions performed on behalf of customers in the following States in which it does not maintain a money transmission license: Alaska, Alabama, Arizona, California, Colorado, Connecticut, Georgia, Hawaii, Iowa, Idaho, Indiana, Kansas, Kentucky, Louisiana, Massachusetts, Maryland, Maine, Michigan, Missouri, North Carolina, New Hampshire, New Jersey, New Mexico, Nevada, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Virginia, Vermont, Washington, and Wisconsin. Each of these States has enacted laws regulating the business of currency exchange and/or money transmission.

#57559901

52.     Given the myriad ways in which Commonwealth develops clients, how information regarding each client and potential client is obtained, and the long period of time over which Commonwealth's client list has been constructed, it would be impossible for Payment Earth (or any other competitor) to reproduce Commonwealth's client list, or any significant portion of that list, without access to the list itself. Accordingly, any client list generated—whether electronically, physically, or otherwise—from Commonwealth's databases, equipment, or other property, constitutes a protectable trade secret.

**Scanlon and Esener Conspire to Damage Commonwealth's Business and Create Payment Earth.**

53.     Unbeknownst to Commonwealth at the time, while still employed by Commonwealth, Scanlon and Esener formed Payment Earth on May 4, 2016.

54.     While still employed by Commonwealth, and with knowledge that they planned to compete against Commonwealth through Payment Earth, Scanlon and Esener devised a scheme to surreptitiously, and in breach of their fiduciary obligations to Commonwealth, improperly manipulate the prices on Commonwealth accounts that Scanlon and Esener serviced.

55.     As part of their scheme, and in anticipation of their plan to compete against Commonwealth, Scanlon and Esener improperly manipulated the markup/spread that was to be received by Commonwealth on one or more accounts they were servicing on behalf of Commonwealth.

56.     Upon information and belief, this improper manipulation of prices was part of Scanlon and Esener's scheme to—after their departure to Payment Earth—subsequently try to leverage the improperly manipulated prices to entice customers to switch their business to Payment Earth. As part of this scheme, Scanlon, Esener, and other Payment Earth employees

#57559901

disparaged Commonwealth to Commonwealth clients by having Payment Earth employees suggest that Commonwealth was impermissibly marking up accounts.

57.     Defendant Scanlon and Esener both terminated their employment from Commonwealth to join Payment Earth on the same day, July 29, 2016.

58.     In connection with Scanlon's termination of his employment with Commonwealth, rather than return the documents in his office, Scanlon claimed that he had the documents destroyed.

**Payment Earth's Disparagement of Commonwealth.**

59.     Upon information and belief, utilizing Commonwealth's confidential and proprietary client list, Defendants have targeted Commonwealth's clients and intentionally and maliciously disparaged Commonwealth and its products and services.

60.     For example, Defendant Esener has personally called Commonwealth clients and falsely and maliciously stated that, with respect to "Commonwealth Foreign Exchange," that "[t]hey're not going to be around anymore" and that "[t]hey are basically being wiped out" and concluded such messages stating that "[t]his is Saygin from Payment Earth."

61.     Commonwealth has lost over 150 accounts since the formation of Payment Earth. To date, Commonwealth has lost at least $900,000.00 in revenue associated with such accounts since the formation of Payment Earth.  Upon information and belief, the false and misleading statements of Defendants have been a substantial contributing factor in these harms to Commonwealth.

#57559901

**Payment Earth's Inducement of Commonwealth's Employees to Join the Scheme, Breach their Employment Agreements, and Unfairly Compete Against Commonwealth.**

62.     Upon information and belief, in furtherance of the scheme to unfairly compete against Commonwealth, Payment Earth has recently induced multiple Commonwealth employees to breach their employment agreements with Commonwealth.

63.     Specifically, upon information and belief, Scanlon, Esener, and Payment Earth solicited Defendant Carl Easton and Defendant Alexander Friedman to breach restrictive covenants they have with Commonwealth in order to join in the scheme.  The fact that Friedman and Easton are employed by Payment Earth is evidenced, in part, by the fact that email accounts are now active for ceaston@paymentearth.com and afriedman@paymentearth.com.

64.     Friedman was hired by Commonwealth in 2014 as an Account Executive.

65.     Easton was hired by Commonwealth in 2010 as an Account Executive.

66.     Just as Commonwealth had devoted significant resources in training and supporting the development of both Scanlon and Esener, Commonwealth also devoted significant resources in the development of both Friedman and Easton.  Both Friedman and Easton utilized and benefited from Commonwealth's confidential and proprietary business information and trade secrets.

67.     Defendants Scanlon and Esener were aware of Easton's and Friedman's restrictive covenants, because, as employees of Commonwealth, Scanlon and Esener both executed restrictive covenants.

68.     Easton and Friedman's employment with Payment Earth, their solicitation of Commonwealth clients, and their utilization of Commonwealth's confidential and proprietary business information and trade secrets are all violations of their employment agreements with Commonwealth.

#57559901

69.     As evidence of Easton and Friedman's intention to join Payment Earth and their conspiracy to unfairly compete against Commonwealth, Commonwealth has recently discovered that both Easton and Friedman also engaged in efforts to improperly manipulate the spreads on the Commonwealth accounts they serviced in anticipation of their departure to Payment Earth. For example, Defendant Friedman quickly inflated the prices on accounts he was servicing for Commonwealth in the months leading up to his departure from Commonwealth to Payment Earth.   These actions not only constitute breaches of their employment agreements, but also, breaches of their fiduciary obligations to Commonwealth.

70.     Defendants Easton and Friedman, like Defendants Scanlon and Esener did before them, both terminated their employment from Commonwealth on the same day, December 19, 2017.  The reasons Easton and Friedman gave for their terminations are, upon information and belief, false.  Friedman stated to Commonwealth's human resources that he was going to be changing careers and working in a different part of the financial services industry, specifically, working for a hedge fund in Hong Kong.  Easton stated to Commonwealth's human resources that he would be exiting the work force entirely to be a stay-at-home father.

71.     Additionally, Payment Earth has recently started marketing that it does "a lot of work with Christian NGO's."  Christian non-governmental entities represent a highly specific subset of an already niche market and is one of the primary verticals in which Defendant Friedman operated.

72.     Upon information and belief, each of the Defendants have engaged in a scheme to damage Commonwealth.  Upon information and belief, each of the individual Defendants remain in violation of their obligations under their employment agreements and are engaged in activities

#57559901

that are improperly utilizing Commonwealth's confidential and proprietary business information and trade secrets.

73.     Some or all of the Defendants remain actively engaged in an effort to improperly solicit Commonwealth's customers and disparage Commonwealth using false and misleading statements.

74.     Commonwealth has already suffered substantial injuries as a result of Defendants' unethical and illegal conduct.  Commonwealth will continue to suffer irreparable harm if Defendants scheme and improper use of Commonwealth's confidential and proprietary business information and trade secrets continues.

**COUNT I**
**Breach of Fiduciary Duties**
**(Scanlon, Esener, Friedman, and Easton)**

75.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

76.     At all relevant times, Scanlon, Esener, Friedman, and Easton each owed common law fiduciary duties to Commonwealth to act in good faith and with the utmost loyalty in the course of their employments.  These obligations required Scanlon, Esener, Friedman, and Easton to be faithful to Commonwealth, to use their best efforts on behalf of Commonwealth, to act in Commonwealth's best interests at all times, and to refrain from activities that would in any way damage Commonwealth's business.

77.     Defendants Scanlon, Esener, Friedman, and Easton misappropriated Commonwealth's confidential and proprietary business information and trade secret information; used Commonwealth's confidential and proprietary business information and trade secret information to solicit Commonwealth employees; and used Commonwealth property and

resources to engage in a scheme to improperly manipulate prices on Commonwealth accounts they were servicing, to misappropriate Commonwealth's confidential and proprietary business information and trade secret information, and to solicit and recruit Commonwealth's business, customers, and employees in competition against Commonwealth.

78.     Defendants Scanlon, Esener, Friedman, and Easton engaged in this conduct for their sole benefit and to the detriment of Commonwealth.

79.     Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

80.     Scanlon, Esener, Friedman, and Easton's conduct was willful, wanton, and malicious.

81.     Commonwealth has no adequate remedy at law.

### COUNT II
### Aiding and Abetting Breach of Fiduciary Duties
### (Payment Earth, Scanlon, and Esener)

82.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

83.     At all relevant times, Scanlon and Esener were high-ranking employees of Commonwealth, and Scanlon, Esener, Friedman, and Easton each maintained important positions of trust and confidence with Commonwealth.

84.     In their roles, Scanlon, Esener, Friedman, and Easton each owed fiduciary duties to Commonwealth to act in good faith and with the utmost loyalty in the course of their employment.  Such obligations required Scanlon, Esener, Friedman, and Easton to be faithful to Commonwealth, to use their best efforts on behalf of Commonwealth, to act in Commonwealth's

#57559901

best interests at all times, and to refrain from activities that would damage Commonwealth's business in any way.

85.     Scanlon, Esener, Friedman, and Easton breached their fiduciary duties to Commonwealth.

86.     Payment Earth was aware that Scanlon, Esener, Friedman, and Easton were employed by Commonwealth and had knowledge of their fiduciary duties to Commonwealth.

87.     Payment Earth, Scanlon, and Esener were aware that Friedman and Easton were employed by Commonwealth and had knowledge of their fiduciary duties to Commonwealth.

88.     Payment Earth induced Scanlon, Esener, Friedman, and Easton to join in a scheme to improperly manipulate prices on Commonwealth accounts they were servicing, to misappropriate Commonwealth's confidential and proprietary business information and trade secrets, to solicit and recruit Commonwealth's business, customers, and employees away from Commonwealth, and to commence a commercial relationship with Payment Earth, a direct competitor of Commonwealth. Accordingly, Payment Earth aided, abetted, and participated in the breach of Scanlon, Esener, Friedman, and Easton's fiduciary duties.

89.     Payment Earth, Scanlon, and Esener induced Friedman, and Easton to join in a scheme to improperly manipulate prices on Commonwealth accounts they were servicing, to misappropriate Commonwealth's confidential and proprietary business information and trade secrets, to solicit and recruit Commonwealth's business, customers, and employees away from Commonwealth, and to commence a commercial relationship with Payment Earth, a direct competitor of Commonwealth. Accordingly, Payment Earth, Scanlon, and Esener aided, abetted, and participated in breach of Friedman and Easton's fiduciary duties.

#57559901

90.     Defendants engaged in this conduct for their sole benefit and to the detriment of Commonwealth.

91.     Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

92.     Each of the Defendants' conduct was willful, wanton, and malicious.

93.     Commonwealth has no adequate remedy at law.

## COUNT III
### Breach of Contract – Confidential Information – Injunctive Relief
### (Scanlon and Esener)

94.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

95.     Scanlon and Esener were subject to employment agreements as a condition of their employment with Commonwealth.

96.     In consideration for the covenants made by Scanlon and Esener, Commonwealth provided them with training, support, and compensation.  Commonwealth performed all of its duties and conditions under the employment agreements.

97.     Scanlon and Esener have breached their employment agreements with Commonwealth by misappropriating Commonwealth's confidential and proprietary business information and trade secrets.

98.     As a consequence of these breaches, Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

#57559901

## COUNT IV
## Breach of Contract – Confidential Information, Non-Solicitation, and Non-Compete
## Injunctive Relief
## (Easton and Friedman)

99.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

100.    Easton and Friedman were subject to employment agreements as a condition of their employment with Commonwealth.

101.    In consideration for the covenants made by Easton and Friedman, Commonwealth provided them with training, support, and compensation.  Commonwealth performed all of its duties and conditions under the employment agreements.

102.    Easton and Friedman have breached their employment agreements with Commonwealth by misappropriating Commonwealth's confidential and proprietary business information and trade secrets.

103.    Easton and Friedman have breached their employment agreements with Commonwealth by being employed by Payment Earth and competing against Commonwealth.

104.    Easton and Friedman have breached their employment agreements with Commonwealth by soliciting customers of Commonwealth.

105.    As a consequence of these breaches, Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

## COUNT V
## Tortious Interference with Contractual Relations – Breach of Employment Agreements
## (Payment Earth, Scanlon, and Esener)

106.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

#57559901

107.     Payment Earth induced Scanlon, Esener, Friedman, and Easton to breach their contractual relations with Commonwealth by causing the individual Defendants to breach their employment agreements with Commonwealth.

108.     Scanlon and Esener induced Friedman and Easton to breach their contractual relations with Commonwealth by causing Friedman and Easton to breach their employment agreements with Commonwealth.

109.     These efforts have severely hindered Commonwealth's ability to perform its contractual duties to clients.

110.     Commonwealth has been unfairly damaged thereby.

**COUNT VI**
**Tortious Interference with Contractual Relations – Customer and Client Relations**
**(All Defendants)**

111.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

112.     At the time of each of the individual Defendants' departures to Payment Earth, Commonwealth was performing work pursuant to contracts with its clients.  Payment Earth was aware of this ongoing contractual work.

113.     Payment Earth individually interfered with Commonwealth's contractual relationships with Commonwealth's customers and clients and has induced Scanlon, Esener, Friedman, and Easton to interfere with Commonwealth's contractual relationships.

114.     Scanlon and Esener individually interfered with Commonwealth's contractual relationships with Commonwealth's customers and clients and have induced Friedman, and Easton to interfere with Commonwealth's contractual relationships.

#57559901

115.    These concerted efforts have severely hindered Commonwealth's ability to perform its contractual duties to clients.

116.    Additionally, Payment Earth has contacted Commonwealth clients for whom Commonwealth is performing contractual work, in an effort to obtain that same work for Payment Earth.

## COUNT VII
### Intentional Interference with Prospective Business Relationships
### (All Defendants)

117.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

118.    Through its over 20 years in business, Commonwealth has developed and continues to develop numerous business relationships.

119.    By virtue of the individual Defendants' employment with Commonwealth, the individual Defendants and their new employer, Payment Earth, are aware of these ongoing and potential business relationships.

120.    Upon information and belief, the Defendants are misusing and/or in a position to misappropriate Commonwealth's confidential and proprietary business information and trade secrets.

121.    In addition, Defendant Esener, and other agents of Payment Earth, have—at the direction of Scanlon and Esener—contacted Commonwealth's clients about Payment Earth, seeking to take business from Commonwealth.

122.    Commonwealth has been unfairly damaged thereby.

#57559901

## COUNT VIII
### Violation of Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq.
### (All Defendants)

123.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

124.    While employed by Commonwealth, the individual Defendants obtained access to Commonwealth's confidential and proprietary business information and trade secrets.

125.    The individual Defendants were aware that they had a duty to maintain confidentiality and not to use for their own purposes the information that they received from Commonwealth.

126.    Commonwealth's confidential and proprietary business information and trade secrets, obtained by the Defendants, is related to Commonwealth's services that are offered and provided in interstate commerce.

127.    Commonwealth's confidential and proprietary business information and trade secrets are trade secrets under 18 U.S.C. § 1839.

128.    Commonwealth took reasonable precautions to maintain the secrecy and confidentiality of its confidential and proprietary business information and trade secrets.

129.    Commonwealth's confidential and proprietary business information and trade secrets is of substantial commercial value, and would provide a competitor an unfair competitive advantage against Commonwealth.

130.    Defendants knew or should have known that they acquired knowledge of Commonwealth's confidential and proprietary business information and trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use.

#57559901

131.    Defendants have willfully and maliciously misappropriated Commonwealth's confidential and proprietary business information and trade secrets in violation of the Defend Trade Secrets Act.

132.    Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

133.    Commonwealth has no adequate remedy at law.

**COUNT IX**
**Violation of Rhode Island Uniform Trade Secrets Act, R.I. Gen. Laws § 6-41-1**
**(All Defendants)**

134.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

135.    While employed by Commonwealth, the individual Defendants obtained access to Commonwealth's confidential and proprietary business information and trade secrets.

136.    The individual Defendants were aware that they had a duty to maintain confidentiality and not to use for their own purposes the information that they received from Commonwealth.

137.    Commonwealth took reasonable precautions to maintain the secrecy and confidentiality of its confidential and proprietary business information and trade secrets.

138.    Commonwealth's confidential and proprietary business information and trade secrets is of substantial commercial value, and would provide a competitor an unfair competitive advantage against Commonwealth.

139.    Defendants knew or should have known that they acquired knowledge of Commonwealth's confidential and proprietary business information and trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use.

#57559901

140. Defendants have willfully and maliciously misappropriated Commonwealth's confidential and proprietary business information and trade secrets in violation of R.I. Gen. Laws §§ 6-41-1 *et seq.*

141. Commonwealth has been damaged, and will continue to be damaged by their conduct if not preliminarily and permanently enjoined.

142. Commonwealth has no adequate remedy at law.

**COUNT X**
**Civil Conspiracy**
**(All Defendants)**

143. Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

144. Defendants reached an agreement to work in concert to accomplish an unlawful enterprise, including, but not limited to: (i) forming Payment Earth to damage Commonwealth; (ii) misappropriating and using Commonwealth's confidential and proprietary business information and trade secrets unlawfully and by improper means; and (iii) seeking to cause Commonwealth clients to disassociate with Commonwealth and enter into agreements with Payment Earth. In doing so, Defendants intended to act illegally or tortuously and have harmed Commonwealth.

145. Defendants are jointly liable for the conduct perpetuated in furtherance of the conspiracy.

**COUNT XI**
**Federal Unfair Competition and False Advertising, 15 U.S.C. § 1125**
**(Scanlon, Esener, and Payment Earth)**

146. Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

#57559901

147.    Payment Earth is engaged in interstate commerce.

148.    The aforesaid acts of Payment Earth and its employees, including, but not limited to, Scanlon and Esener, for example, stating that "Commonwealth Foreign Exchange" is "not going to be around anymore" and that "[t]hey are basically being wiped out," constitute the intentional use of words, terms, names, and combinations thereof and false and misleading misrepresentations of fact that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association with Commonwealth, or other commercial activities by Commonwealth.

149.    The aforesaid acts of Payment Earth and its employees, including, but not limited to, Scanlon and Esener, constitute false and misleading descriptions and representations and false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

150.    The aforesaid acts of Payment Earth and its employees, including, but not limited to, Scanlon and Esener have caused, and are causing, great and irreparable harm and damage to Commonwealth, and, unless permanently restrained by this Court, said irreparable injury will continue.

151.    Commonwealth has been damaged thereby.  It has no adequate remedy at law.

**COUNT XII**
**Commercial Disparagement**
**(Scanlon, Esener, and Payment Earth)**

152.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

153.    The aforesaid acts of Payment Earth and its employees, including, but not limited to, Scanlon and Esener, for example, stating that "Commonwealth Foreign Exchange" is "not

#57559901

going to be around anymore" and that "[t]hey are basically being wiped out," are false and untrue, and disparaged Commonwealth.

154.    Payment Earth and its employees, including, but not limited to, Scanlon and Esener, published these false and disparaging statements concerning Commonwealth's services and its operation as a going concern, and mislead Commonwealth's customers.

155.    Payment Earth and its employees, including, but not limited to, Scanlon and Esener, published these false and disparaging statements about Commonwealth to a wide audience of Commonwealth customers, causing Commonwealth to suffer special damage, including the pecuniary harm from the loss of important clients, and irreparable injury to Commonwealth's reputation.

156.    Payment Earth and its employees, including, but not limited to, Scanlon and Esener, published these false and misleading statements with knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

## <u>COUNT XIII</u>
**Corporate Defamation**

157.    Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

158.    The aforesaid acts of Payment Earth and its employees, including, but not limited to, Scanlon and Esener, for example, stating that "Commonwealth Foreign Exchange" is "not going to be around anymore" and that "[t]hey are basically being wiped out," are false and untrue, and disparaged Commonwealth.

159.    Payment Earth and its employees, including, but not limited to, Scanlon and Esener, published these false and disparaging statements concerning Commonwealth's services and its operation as a going concern, and mislead Commonwealth's customers.

#57559901

160.     Payment Earth and its employees, including, but not limited to, Scanlon and Esener, published these false and disparaging statements about Commonwealth to a wide audience of Commonwealth customers, causing Commonwealth to suffer special damage, including the pecuniary harm from the loss of important clients, and irreparable injury to Commonwealth's reputation.

**COUNT XIV**
**Intentional Access to Computer Information without Authorization**
**(Scanlon, Esener, Friedman, and Easton)**

161.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

162.     The individual Defendants intentionally used Commonwealth's computer and email system to engage in conduct that was not authorized by Commonwealth and in a manner that was expressly prohibited by the Commonwealth employee handbook and their employment agreements.

163.     The individual Defendants engaged in a scheme to improperly manipulate Commonwealth accounts using Commonwealth's computer network.

164.     Upon information and belief, the individual Defendants transferred Commonwealth files electronically from Commonwealth's computer network.

165.     Without authorization, the individual Defendants accessed Commonwealth's computer systems intentionally and knowingly, and accessed Commonwealth's confidential and proprietary business information.  Commonwealth never authorized the individual defendants to improperly manipulate accounts or remove any files or data by electronic means from Commonwealth.

#57559901

166. By improperly manipulating accounts and accessing and removing files and data from Commonwealth's network through electronic means, the individual Defendants violated R.I. Gen. Laws §§ 11-52-3 and 11-52-6(a).

167. Commonwealth has been damaged thereby.

**COUNT XV**
**Federal Computer Fraud Act**
**(Scanlon, Esener, Friedman, and Easton)**

168. Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

169. The individual Defendants intentionally used Commonwealth's computer and email system to engage in conduct that was not authorized by Commonwealth and in a manner that was expressly prohibited by the Commonwealth employee handbook and their employment agreements.

170. Without authorization, the individual Defendants accessed Commonwealth's computer systems intentionally and knowingly, and accessed Commonwealth's confidential and proprietary business information, in violation of 18 U.S.C. § 1030(a)(2)(c).

171. The computers that the individual Defendants used to unlawfully access Commonwealth's confidential and proprietary business information was used in interstate commerce and therefore is a "protected computer" within the meaning of 18 U.S.C. § 1030(2)(b).

172. As a result of the individual Defendants' conduct, Commonwealth has suffered damage and loss in the diminution in value of the confidential and proprietary business information that the individual Defendants unlawfully accessed.

#57559901

## COUNT XVI
### Conversion
### (All Defendants)

173.     Commonwealth repeats and realleges all preceding paragraphs as though fully set forth herein.

174.     Commonwealth owns and has all the right to possess Commonwealth's confidential and proprietary business information and trade secrets, which was misappropriated by the individual Defendants.

175.     Commonwealth has the right to the immediate possession of Commonwealth's confidential and proprietary business information and trade secrets.

176.     By refusing to return Commonwealth's confidential and proprietary business information and trade secrets, the Defendants have knowingly and intentionally converted it to their use and interfered with Commonwealth's right to possession of its confidential and proprietary business information and trade secrets.

177.     Defendants' interference with Commonwealth's right to possession of Commonwealth's confidential and proprietary business information and trade secrets has caused Commonwealth damages.

**WHEREFORE,** Commonwealth Foreign Exchange, Inc. requests this Court to:

1.     Commonwealth accordingly seeks a preliminary and permanent injunction:

   a.     Preliminarily and permanently enjoin Payment Earth from soliciting or employing any other current or former Commonwealth employees that are subject to non-competition agreements for the duration of such terms;

#57559901

b.      enjoining Defendants Easton and Friedman from soliciting or employing any current or former Commonwealth employees for a period of 12 months;

c.      enjoining Defendants Easton and Friedman from violating their post-termination prohibitions on competing against Commonwealth, including, but not limited to, enjoining acceptance of employment with a competitor of Commonwealth, including, but not limited to, Payment Earth, for a period of 12 months;

d.      enjoining Defendants from disparaging Commonwealth;

e.      enjoining all Defendants from disclosing or using Commonwealth's confidential and proprietary business information and trade secrets, including, but not limited to, Commonwealth's customer or pricing information;

f.      compelling Defendants to return to Commonwealth all of Commonwealth's confidential and proprietary business information and trade secrets, including, but not limited to, Commonwealth's customer and pricing information.

2.      Compensatory, statutory, and punitive damages in an amount to be proven at trial;

3.      Attorney's fees, costs, and pre and post judgment; and

4.      Such other and further relief that the Court may deem just and proper.

#57559901

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

COMMONWEALTH FOREIGN EXCHANGE, INC.

By its Attorneys,

*/s/ Mitchell R. Edwards*
Mitchell R. Edwards (#6942)
Christina L. Lewis (#7633)
Thomas J. Pagliarini (#9330)
Hinckley, Allen & Snyder LLP
100 Westminster Street, Suite 1500
Providence, Rhode Island 02903
Telephone: (401) 274-2000
Facsimile: (401) 277-9600
medwards@hinckleyallen.com
clewis@hinckleyallen.com
tpagliarini@hinckleyallen.com

DATED: March 14, 2018

#57559901

## <u>VERIFICATION</u>

I, David Theriault, Chief Financial Officer of Commonwealth Foreign Exchange, Inc., certify that I have read the above Verified Complaint and that the foregoing is true to the best of my knowledge, information and belief.

Dated: 3/12/2018

David Theriault

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE

On this 12ᵀᴰ day of March, 2018, before me, the undersigned officer, personally appeared David Theriault, known to me, and executed the foregoing document for the purposes therein contained, by signing the name of himself.

Michelle B. Daugherty
Notary Public
my Commission Expires: 2/11/2020
Dated: 3/12/18